UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:07-CV-129-D

| | |
|---|---|
| CLIFTON L. OUTLAW, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the Court on the parties' Cross Motions for Judgment on the Pleadings. **[DE-17 & 19]**. The time for the parties to file any responses or replies has expired. Accordingly, these motions are now ripe for adjudication. Pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3), the underlying action seeks judicial review of the final decision by the Defendant denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Social Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(b)(1), this matter is before the undersigned for a memorandum and recommendation. For the reasons set forth herein, the undersigned RECOMMENDS that the matter be remanded to the Administrative Law Judge ("ALJ") to make a factual determination as to whether Plaintiff's pain can be considered a nonexertional impairment. It is further RECOMMENDED that the matter be remanded to the ALJ to obtain the testimony of a Vocational Expert at step five to determine whether Plaintiff retains the ability to perform specific jobs which exist in the national economy. In light of the forgoing it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings **[DE-17]** be DENIED IN PART AND GRANTED IN PART and the Defendant's Cross-Motion for Judgment on the Pleadings **[DE-19]** be DENIED IN PART

AND GRANTED IN PART.

## Statement of the Case

Plaintiff applied for DIB and SSI on November 15, 2004, alleging that he became unable to work on August 23, 2004, due to his heart problems, diabetes, and poor eyesight. [R. at 44-53]. His applications were denied initially and on reconsideration and he timely filed a request for hearing. Id. at 32-42. A hearing was held on January 12, 2007, before an ALJ. Id. at 369-84, 14-26. The ALJ concluded that Plaintiff was not disabled during the relevant time period in a decision dated March 5, 2007. Id. at 14-26. Subsequently, on July 17, 2007, the Social Security Administration's Office of Hearings and Appeals denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Defendant. Id. at 6-9. Plaintiff filed the instant action on August 6, 2007. **[DE-4]**.

## Standard of Review

The Court is authorized to review the Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

2

Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, it is this Court's duty to determine both whether the Commissioner's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

## Analysis

The Social Security Administration has promulgated the following regulations, which establish a five-step sequential evaluation process that must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App. I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

Here, the ALJ employed the five-step evaluation. First, he found that Plaintiff is no longer engaged in substantial gainful employment. [R. at 19]. At step two, he concluded that Plaintiff

3

suffered from the following severe impairments: arthritis, heart disease, and diabetes. Id. In completing step three however, the ALJ determined that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." Id.

The ALJ then proceeded with step four of his analysis and determined that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of light work. Id. Based on this finding, the ALJ found that Plaintiff could not perform his past relevant work. Id. at 25. Finally, at step five, the ALJ concluded that the Medical-Vocational Guidelines ("Grids") Rules 202.13 and 202.14, directed a finding that Plaintiff was not disabled at any time through the date of his decision. Id. The ALJ did not use the services of a vocational expert ("VE") nor did one testify at the hearing. A summary of the evidence cited and relied upon by the ALJ now follows.

For several years, Plaintiff was employed as a small engine mechanic for the Big Blue Store. Id. at 21, 202. He is single, independent, and fairly active considering his age. Id. However, his treatment records reveal that Plaintiff has an extensive history with heart problems. Id. at 21. For example, in April 2001, Plaintiff underwent a four-vessel coronary artery bypass graft (R. at 21, 119); in March 2002, he had a heart attack (R. at 21, 194); and in February 2003, he had a stent placed in the obtuse marginal branch of his heart. Id. at 21, 219-20.

Shortly after the stent placement, Plaintiff was examined by Dr. Alan N. Kirollos who reported that Plaintiff did not have any acute distress and was doing well overall. Id. at 21, 219. Dr. Kirollos' physical examination revealed that Plaintiff weighed 198.5 pounds and his blood pressure was 94/52. Id. In addition, his heart had a regular rhythm with no murmurs, his lungs were

4

clear, his respirations were even and unlabored, and his lower extremities did not exhibit pitting edema. Id. Furthermore, during the neurological exam, there were no focal deficits, and psychiatrically, the doctor noted that Plaintiff was alert and oriented. Id. In general, Dr. Kirollos' diagnostic impression was that Plaintiff had exertional shortness of breath, coronary artery disease, hypercholesterolemia, which was being treated with Zocor, and his hypertension was controlled. Id. He concluded that Plaintiff should continue with his cardiac medications and follow-up in six months. Id.

In December 2003, Plaintiff was treated at the emergency room of Lenoir Memorial Hospital by Dr. Reginald K. Sherad for complaints of substernal chest pressure that radiated to his arms, and caused sweating, nausea, and vomiting. Id. at 21, 93. Plaintiff's chest x-ray showed a cardiomegaly with no failure. Id. at 21, 95. In addition, an EKG exhibited a heart rate of 84 beats per minute with a normal axis with Q waves inferiorly and junctional rhythm. Id. In his diagnostic assessment, Dr. Sherard concluded that Plaintiff suffered from chest pain and coronary artery disease, but he ruled out myocardial infarction versus unstable angina. Id.

Plaintiff's longitudinal medical record reveals that he was treated from January 15, 2002, until June 7, 2005, at the Kinston Community Health Center by Dr. Aydin Atilla for hypertension and diabetes. Id. at 21, 137. During an examination on June 18, 2004, Dr. Atilla stated that the Plaintiffs was doing well, despite complaints of fatigue, and left shoulder and arm pain. Id. at 21, 140. Plaintiff denied having chest pain. Id. His physical examination was within normal limits except for edema of the upper extremities. Id. On July 12, 2004, Dr. Attila reported that Plaintiff's blood sugar was 91. Id. at 21, 139. In addition, Plaintiff was examined on November 4, 2004, but

5

no complaints were noted. Id. at 21, 138. Plaintiff's last documented visit with Dr. Atilla was on June 7, 2005. Id. at 21, 137. During that visit, the doctor treated Plaintiff for a foreign body in his right eye. Id. Dr. Atilla also prescribed new medications for Plaintiff's diabetes and hypertension. Id.

In December 2004, Plaintiff was seen by Dr. Maqsood Ahmed, who performed a consultative examination to evaluate Plaintiff's diabetes, hypertension, arthritis, coronary artery disease, and blurred vision. Id. at 21, 295. During the examination, Dr. Ahmed noted that the x-rays of Plaintiff's knees, taken in November 2003, exhibited degenerative osteoarthritis. Id. In addition, Plaintiff indicated that he has a history of intermittent chest pain, shortness of breath, and diabetes, which was diagnosed in 2003. Id. at 21, 196. Plaintiff also reported that his blood sugar ranged around 100, his blood pressure is well controlled with medication, but fluctuates due to pain, and that he has arthritis pain in his shoulder and leg. Id. Although Plaintiff's arthritic pain was intermittent with a severity of 6 on a 0-10 scale, he usually just takes aspirin for relief. Id. Based on this examination, Dr. Ahmed determined that Plaintiff had arthritic changes in both knees, Heberden's nodes in both hands; difficulty walking on heel and toe; and difficulty squatting and rising. Id. Thus, the doctor concluded that Plaintiff's "prognosis for gainful employment [was] guarded due to his osteoarthritis of his knees and chronic pain." Id.

In July 2005, Plaintiff was treated at the emergency room of Pitt County Memorial Hospital for chest, back, and arm pain that was caused by falling from a cherry-picking machine. Id. at 22, 336. A physical examination revealed left clavicle and rib fractures. Id. Plaintiff was treated for pain control, but did not report any acute distress and was discharged in stable condition with a sling

for his left arm. Id. at 22, 337.

From October 2005, through December 2006, Plaintiff was treated at the LaGrange Medical Center by Drs. Carl L. Haynes and Scott Gogulski for his diabetes, hypertension, and osteoarthritis. Id. at 22, 341. His treatment records indicate that he was noncompliant with his medication regimen and either failed to appear, or cancelled several appointments. Id. at 22, 341, 345. During a visit in January 2006, he told Dr. Haynes that he has had arthritis since he was 18 years old, treated this condition with medications for a short period of time, but had never taken long term medications. Id. at 22, 346.

In April 2006, Plaintiff was examined by Dr. Gogulski for continued complaints of bilateral knee pain; the pain was more symptomatic in his right knee. Id. at 22, 345. The physical examination revealed that Plaintiff had crepitus on flexion/extension on both knees; the crepitus was more notable on the right knee than the left. Id. However, the exam also revealed that there was no edema to the right knee, no popliteal tenderness in either knee, no calf tenderness, and no valgus or varus instability on testing with the knee in 90 degree and 45 degree angles. Id. As treatment for Plaintiff's knee pain, Dr. Gogulski gave him an epidural steroid injection in his right knee and discontinued his Tramadol prescription and placed him on Tylenol Arthritis. Id.

In June 2006, Plaintiff was examined by Dr. Gogulski again. Id. at 22, 344. Plaintiff reported that the injection he received during his previous visit helped relieve his right knee pain, so he requested the same injection for his left knee. Id. As a result, Dr. Gogulski gave him an epidural steroid injection in his left knee. Id. Dr. Gogulski's notes indicate that Plaintiff's blood pressure was 122/72, his diabetes was stable, and his blood pressure was well controlled. Id. Dr.

Gogulski instructed him to continue his medications for his coronary artery disease and he concluded that Plaintiff had osteoarthritis of the knees. Id.

Several months later, in September 2006, Plaintiff was seen by Dr. Gogulski for a checkup. Id. at 22, 343. During the checkup, Plaintiff's blood work revealed increased liver enzymes. Id. He told the doctor that he drank heavily for about seven years, but denied any alcohol use over the last 5-6 years and was not aware of having received any transfusions. Id. In October 2006, Dr. Haynes evaluated Plaintiff for his uncontrolled diabetes. Id. at 22, 342. During the visit, Plaintiff reported that one his medications for his diabetes caused nausea and vomiting, so the doctor discontinued it. Id. He also indicated that his blood sugar fluctuates between 100 and 200. Id.

On December 13, 2006, Plaintiff was evaluated by Dr. Haynes for complaints of worsened arthritis pain in the left shoulder, neck, and right knee as well as shortness of breath with exertion. Id. at 22, 341. An EKG revealed normal sinus rhythm with resolution of bradycardia. Id. In addition, Plaintiff's physical examination revealed that his blood pressure was 128/80, he had some stiffness with motion in both knees, and he also had large Heberden nodes on several of his fingers. Id. Based on this examination, Dr. Haynes concluded that Plaintiff has generalized osteoarthritis, diabetes, hypertension, and hyperlipidemia. Id. at 22, 341.

A couple of weeks after his visit with Dr. Haynes, on December 21, 2006, Dr. Kirollos performed a heart catheterization. Id. at 23, 361. Dr. Kirollos' treatment notes indicate Plaintiff's left main coronary was a moderate size with no significant disease, his left anterior descending coronary artery was moderate in size with proximal 95% stenosis, there was 50% stenosis in the distal portion of the vessel, the left circumflex coronary artery was moderate in size with proximal

8

70% stenosis and the right coronary artery was moderate in size and dominant with proximal 100% occlusion. Id. He also determined that Plaintiff had 3-vessel coronary artery disease, patent grafts to the LAD, 1st diagonal branch and posterior descending coronary artery disease distal to the graft and occluded 1st obtuse marginal branch, and moderate aortic stenosis. Id. at 23, 362. In a follow-up visit in January 2007, Dr. Kirollos' treatment notes indicate that Plaintiff had complaints of chest pain with minimal exertion and exertional shortness of breath, but was otherwise in no acute distress. Id. at 23, 355-56. During Plaintiff's physical examination, the EKG revealed normal sinus rhythm with inferior infarct. Id. at 23, 356. Dr. Kirollos' diagnostic impression reported chest pain and exertional shortness of breath, coronary artery disease, moderate aortic stenosis and occluded obtuse marginal graft with 70% stenosis of the circumflex with other grafts being patent by cardiac catheterization, hypertension, diabetes, hypercholesterolemia, and a history of elevated liver enzymes. Id. In addition, the doctor added Atenolol, Plavix, and Welchol to Plaintiff's medication regimen. Id.

In his testimony, Plaintiff described the history of his cardiac condition and noted that he took medications to control his heart rate. Id. at 23, 375, 378. He also described other ailments including diabetes, pneumonia, and arthritic pain in his back and knees. Id. at 23, 375-77. In addition, he said that he was only able to walk 1-2 blocks before his legs became tired and started to ache, and he became short of breath on exertion. Id. at 23, 377. He also said that his doctors mentioned surgery to treat his arthritic pain; especially on his knees. Id. at 376. Plaintiffs testified that his daily activities include feeding his animals and doing household chores. Id. at 23, 378. However, he testified that he could no longer engage in leisurely activities, such as fishing or

9

hunting, because it required too much walking. Id. at 23, 379. Finally, Plaintiff explained that during his last doctor's visit, his doctors found another blockage in his heart and would have to schedule another stent procedure. Id. at 380-81.

In addition to Plaintiff's testimony, his lifelong friend, Douglas Stanley, also testified about his condition. Id. at 23, 381-83. Mr. Stanley testified that he interacted with Plaintiff daily and based on his observations, Plaintiff's memory has deteriorated and he has trouble doing his chores because he has to take frequent breaks because of shortness of breath. Id. at 383. Mr. Stanley also opined that Plaintiff would not be able to perform any activity that lasts eight hours a day, even if he had 30 minute breaks. Id.

> With regards to Plaintiff's testimony, the ALJ stated:
>
> The undersigned finds that the claimant does have pain causing functional limitations, but that his complaints are not fully persuasive. The claimant has not required such aggressive measures for symptom relief such as enrollment in physical therapy or a pain management program. The claimant's allegation that his impairments, either singly or in combination, produce symptoms and limitations of sufficient severity to prevent all sustained work activity is inconsistent with the medical and other evidence of record and is not considered to be fully credible. The treatment notes throughout reveal the claimant was active and independent in activities of daily living. In fact, the claimant was treated at the emergency room in July 2005 after falling 7-feet from a cherry picking type machine. The medical evidence do [sic] reveal any evidence of a change in motor tone or bulk such as disuse atrophy, or other change in body habitus or constitutional appearance such as weight loss, which might be expected in a person whose activities are markedly restricted due to a debilitating disease process. The Administrative Law Judge finds that the medical evidence reveals that the claimant's condition is basically stable when he is compliant with his medications. Consequently his complaints are not found to be fully persuasive and have been given little weight.

Id. at 24.

In addition to testimony from Plaintiff and his friend, the ALJ also considered the RFC

assessment from the non-examining state agency medical consultant. Id. at 24. The consultant concluded that Plaintiff retains the ability to perform light work with postural and environmental limitations. Id. at 24, 302, 304. The ALJ gave this opinion considerable weight. Id. at 24.

After weighing all of the evidence of record, the ALJ made the following findings regarding Plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to sit for 6 hours in an 8-hour workday; stand and walk for 6 hours in an 8-hour work day; lift and carry 20 pounds occasionally and 10 pounds frequently. This residual functional capacity would perform [sic] the claimant to perform the full range of light work.

Id. at 19.

Based on the record, the Court finds that there was substantial evidence to support the ALJ's conclusions through step four of the sequential analysis.

## **Assignments of Error**

Plaintiff cites five assignments of error: 1) the ALJ's credibility and pain determination was not proper; 2) there was an improper assessment of his RFC; 3) there was no VE at the hearing, and there was improper use of the grid regulations to deny his claim; 4) the medical assessment was not proper; and 5) there was a lack of substantial evidence.[1] **[DE-18, p. 6-16]**. The crux of Plaintiff's

---

[1] It was often difficult to determine to whom Plaintiff's counsel was referring to in his brief. There are numerous references to the Plaintiff as "she," "her," and "lady" throughout the argument section although Plaintiff is a male. See [Plaintiff's Memorandum in Support, DE-18, pgs. 8, 11, 13, 14]. Plaintiff's counsel also cites records and impairments that have not been asserted and may not exist. Id. at 8, 13 For example, in the assignment of error discussing the credibility and pain determination, Plaintiff suggests there is a "lengthy summary of impairments listed in the request for approval of *her* file on the record." [DE-18, p. 8] (emphasis added). Plaintiff also contends that these impairments could reasonably cause Plaintiff's pain, or "could be exacerbated by *her* obesity." Id. However, the summary that Plaintiff's counsel refers to is not contained in the record, and Plaintiff never alleged obesity as an impairment in his medical records or testimony. In addition, in Plaintiff's argument regarding the

11

arguments, 1, 4, and 5, is that the ALJ improperly weighed and evaluated the evidence before him. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Rather, this Court must uphold the Defendant's factual findings if they are supported by substantial evidence. For this reason, the Court will not consider these assignments of error.

The remaining assignments of error are intertwined. As a result, the court will consider them together. In addition, when discussing his RFC assessment, Plaintiff renews his argument regarding the ALJ's credibility determination. **[DE-18, pgs. 11-12]**. For the reasons noted above, this portion of the argument will not be addressed further.

### 1. Plaintiff's RFC Determination and Absence of VE Testimony

The ALJ concluded that Plaintiff is capable of performing light work. [R. at 19]. He reached this RFC determination after evaluating the medical evidence in the record and the hearing testimony. A summary of the evidence that the ALJ relied on is discussed above.

Despite substantial evidence to support the RFC determination, the ALJ erred at step five of the sequential analysis. Specifically, he failed to discuss whether Plaintiff has a nonexertional impairment, if it affected his ability to work, and he failed to utilize the testimony of a VE.

---

accuracy of his medical assessment, he asserts that "[t]he ALJ should have taken an opportunity to examine the totality of the records in the file instead of trying to build a case against this *lady* on the grounds she lacked credibility." Id. at 13. Plaintiff further alleges that Plaintiff's age "will not preclude an individual who has such impairments from being found disabled." Id. However, the impairment that Plaintiff is referring to is Chronic Fatigue Syndrome. Id. There is nothing in Plaintiff's medical records or his testimony that indicates he ever mentioned that this was one of his impairments. Thus, these arguments are unavailing and undermine the persuasiveness of Plaintiff's arguments.

If a claimant has strength or exertional impairments that prevent him from performing the full range of work at a given exertional level, the Commissioner may rely solely on the Grids to satisfy his burden of proof. Coffman v. Bowen, 829 F.2d 514, 518 (4th Cir. 1987). To the extent that nonexertional impairments further limit the range of jobs available to the claimant, the Grids may not be relied upon to demonstrate the availability of alternative work activities. Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983). Instead, when a claimant suffers from both exertional and nonexertional limitations, the Grids are not conclusive, but may serve as a guide or framework for the ALJ's decision. Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989).

A nonexertional limitation "is a limitation that is present whether the claimant is attempting to perform the physical requirements of the job or not . . . [s]uch limitations are present at all times in a claimant's life, whether during exertion or rest." Gory v. Schweiker, 712 F.2d 929, 930 (4th Cir. 1983). In addition, a nonexertional limitation also "places limitations on functioning or restricts an individual from performing a full range of work in a particular category." Aistrop v. Barnhart, 36 Fed. Appx. 145, 146 (4th Cir. 2002) (unpublished opinion). Typically, these limitations include conditions such as pain, loss of hearing, loss of manual dexterity, postural limitations, and pulmonary impairments. Coffman, 829 F.2d at 518 (quoting Grant, 699 F.2d at 192); see also, 20 C.F.R. § 1569a (c)(v) - (vi) (stating that nonexertional limitations can include "difficulty tolerating some physical feature(s) of certain work settings, e.g., you cannot tolerate dust or fumes" as well as "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching").

However, not every nonexertional limitation or malady will be considered a nonexertional

13

impairment, so as to preclude reliance on the Grids. Walker, 889 F.2d at 49. The proper inquiry is whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable. Id. When a claimant suffers from nonexertional limitations, the Commissioner must produce a VE to testify that the particular claimant retains the ability to perform specific jobs that exist in the national economy. Grant, 699 F.2d at 192.

Here, the ALJ found that Plaintiff had the RFC to perform a full range of light work, without determining whether Plaintiff's pain should be considered a nonexertional impairment. This conclusion was erroneous. In his decision, the ALJ acknowledged that Plaintiff has pain that causes "functional limitations." [R. at 24]. However, the ALJ failed to address whether these "functional limitations" rise to the level of nonexertional impairments. Without discussing this distinction in Plaintiff's RFC assessment, it is unclear whether Plaintiff's pain should be considered a nonexertional impairment, which would preclude the ALJ's reliance on the Grids. As a result, this case should be remanded to make a factual determination of whether Plaintiff's pain qualifies as a nonexertional impairment that would limit the range of jobs that were available to him at the light work level. Woody v. Barnhart, 326 F. Supp. 2d 744, 753 (W.D.Va. 2004).

In addition to failing to discuss the extent of Plaintiff's pain and its relationship to his RFC, the ALJ also failed to discuss the postural and environmental limitations that were reported by the state-agency medical consultant. Specifically, when assessing Plaintiff's RFC, the consultant concluded that Plaintiff should only occasionally climb a ramp, stairs, ladders, ropes, and scaffolds. Id. at 302. The consultant also determined that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation as well as hazards such as machinery and heights.

14

Id. at 304. Although the ALJ wrote that he gave these opinions "considerable weight" there is no indication in the record that he considered them in his determination that Plaintiff could perform a full range of light work. Id. at 24-25. Under controlling Fourth Circuit precedent and the regulations, these limitations qualify as nonexertional limitations because they would be present whether Plaintiff was attempting to perform the physical requirements of a job or not. See, e.g., Coffman, 829 F.2d at 518 (stating that nonexertional limitations can include postural limitations); 20 C.F.R. § 1569a (c)(v) (concluding that nonexertional limitations can include difficulty tolerating some physical features of certain work settings, such as dust or fumes). As a result, the ALJ was required to utilize the testimony of a VE at step five of the sequential evaluation. Grant, 699 F.2d at 192. Therefore, this case should be remanded to secure the testimony of a VE on the issue of whether Plaintiff retains the ability to perform specific jobs that exist in the national economy.

## Conclusion

For the reasons discussed above, it is HEREBY RECOMMENDED that the matter be remanded to the ALJ to make a factual determination as to whether Plaintiff's pain should be considered a nonexertional limitation. It is further RECOMMENDED that the matter be remanded to obtain the testimony of a Vocational Expert at step five to determine whether Plaintiff retains the ability to perform specific jobs which exist in the national economy.

The undersigned finds that substantial evidence supports each of the Defendant's findings through step four of the sequential analysis. In light of the forgoing, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings be DENIED and Defendant's Motion for Judgment on the Pleadings be GRANTED with regard to all aspects of the Defendant's decision through step

15

four of the sequential evaluation. However, because the ALJ failed to discuss whether Plaintiff has a nonexertional impairment and failed to utilize the testimony of a VE at step five of the sequential analysis, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings be GRANTED and Defendant's Motion for Judgment on the Pleadings be DENIED with regard to the Defendant's finding at step five that Plaintiff could perform a full range of light work.

DONE AND ORDERED in Chambers at Raleigh, North Carolina this th day of May 7, 2008.

_____
William A. Webb
U.S. Magistrate Judge